## In re NVE CORPORATION SECURITIES LITIGATION.

Civil No. 06–574 (MJD/JJG).

United States District Court,
D. Minnesota.

July 3, 2007.

Gregg M. Corwin, Gregg M. Corwin & Associates Law Office, PC, St. Louis Park, MN, and William B. Federman, Federman & Sherwood, Counsel for Plaintiffs.

Peter W. Carter, Thomas M. Jancik, and Seth J.S. Leventhal, Dorsey & Whitney LLP, Minneapolis, MN, Counsel for Defendants NVE Corporation, Daniel A. Baker, James M. Daughton, and Jeffrey K. Kaszubinski.

## MEMORANDUM OF LAW & ORDER

MICHAEL J. DAVIS, District Judge.

## I. INTRODUCTION

This matter is before the Court on Defendants' Amended Motion to Dismiss. [Docket No. 45] The Court heard oral argument on March 9, 2007.

## II. BACKGROUND

### A. Factual Background

#### 1. Parties

NVE Corporation ("NVE") is a Minnesota-based corporation that specializes in spintronics, nanotechnology used to store information using electron spin. (Am. Compl.¶¶ 12, 28.) At all relevant times, NVE was listed and actively traded on the NASDAQ. (*Id.* ¶ 174(a).) NVE licenses intellectual property, such as Magnetic Random Access Memories ("MRAM") technology, and sells spintronic products. (*Id.* ¶¶ 12, 28.) NVE licensed its MRAM patents to other companies including Cypress Semiconductor Corporation ("Cypress") and Motorola, Inc. ("Motorola"). (*Id.* ¶ 3.) Cypress's wholly-owned subsidiary, Silicon Magnetic Systems ("SMS"), was formed to pursue MRAM development. (*Id.* ¶ 42.) NVE disclosed in its SEC filings that, when it formed its relationship with Cypress and SMS in 2002, it was dependent on its licensees, particularly Cypress and Motorola, to convert NVE's intellectual property into commercially viable MRAM. (*Id.* ¶ 43.)

Currently before the Court is a purported securities fraud class action lawsuit brought on behalf of all persons who purchased or acquired NVE securities during the period of May 16, 2003 through April 19, 2005. Generally, Plaintiffs claim that, during the Class Period, NVE's CEO, President, and Director, Daniel A. Baker; NVE's Chief Technology Officer and Director, James M. Daughton; and NVE Director, Jeffrey K. Kaszubinski (collectively "Individual Defendants"); and NVE issued a series of false and misleading statements regarding the development of MRAM, which supposedly had the potential to combine the speed of semiconductor memory with the non-volatility of magnetic desk drives and could eventually replace conventional memories. (Am.Compl.¶ 2.) Plaintiffs assert that, in fact, NVE's MRAM technology did not constitute a breakthrough, that it was not being used in Cypress's and SMS's MRAM technology, that Cypress and SMS were many years away from developing a production-

ready MRAM product that could be successfully commercialized, and that NVE's MRAM patents were immaterial and unenforceable. (*Id.* ¶¶ 6, 51.)

During the Class Period, Daughton served on the Board of Directors of SMS. (Am.Compl.¶ 14.) During the Class Period, Kaszubinski served as President, CEO, and Director of SMS. (*Id.* ¶ 15.)

### 2. Defendants' Statements

The Class Period begins on May 16, 2003, when NVE filed its 2003 Annual Report on SEC Form 10–KSB, which, among other things, discussed the April 2002 technology exchange agreement between NVE and Cypress and stated that Cypress had announced plans to have MRAMs in production by the end of calendar year 2003. (Am.Compl.¶ 101.)

Altogether, Plaintiffs allege twenty groups of false or misleading statements. (Am.Compl.¶¶ 101, 105, 107, 111, 113, 115, 118, 122, 126, 129, 134, 136, 138, 141, 143, 146, 148, 153, 157, 159.)

### 3. Decline in Stock Prices

On February 14, 2005, Cypress issued a press release revealing that it would divest SMS because it concluded that MRAM could only be "a niche technology with higher bit pricing than that of SRAM." (Am.Compl.¶ 164.) Plaintiffs allege that, after this announcement, NVE's common stock price fell from $28.36 per share on February 11, 2005, to $25.98 on February 14, 2005, and to $17.04 per share on April 19, 2005, when NVE issued a press release stating that it would focus on licensing its MRAM intellectual property and no longer seek to sell MRAM devices. (*Id.* ¶¶ 5, 165, 169.) NVE's stock price continued to fall until it closed at $14.85 per share on April 20, 2005. (*Id.* ¶ 170.) NVE continues to exist and to attempt to develop MRAM technology, although it has achieved profit-

ability by manufacturing less complicated spintronic chips. (*Id.* ¶ 173.)

### 4. Problems with MRAM Technology

Plaintiffs allege that NVE had problems with its MRAM patents and with MRAM technology development. In Paragraphs 49 through 61 of the Amended Complaint, Plaintiffs allege that NVE's patents do not cover the inventions used to create magnetic or spin memory cells, which is the technology that makes MRAM chips possible. (Am.Compl.¶ 56). They claim that NVE's MRAM patents are preceded by prior art by Motorola and IBM. (*Id.* ¶ 58.) They conclude that NVE's MRAM intellectual property is "unenforceable and immaterial." (*Id.* ¶ 61.) There is no allegation that the Patent Office or any court has found the patents unenforceable, that there has been any litigation regarding this allegation, or that any other patent holders have alleged this.

In Paragraphs 62 though 100 of the Amended Complaint, Plaintiffs allege that SMS "experienced significant, if not insurmountable difficulties with the development of commercially viable MRAM technology from the initiation of its MRAM project right up to the point when Cypress announced in February 2005 that it was abandoning the SMS [ ] MRAM project and divesting its SMS subsidiary." (Am. Compl.¶ 62.)

The main technological development issue was termed the "blinky bits" problem. Plaintiffs allege that when the engineers "would test the data placed on the memory, it was supposed to stay in one spot on the device. However, because of the design, the data would not stay where it was supposed to, and it was dubbed 'blinky.' " (Am. Compl. ¶ 87; *see also* ¶¶ 82, 87, 98, 103.) Confidential Source No. 7 stated that this problem occurred in mid-to-late 2002 and "led to questions about the ability

to obtain a good yield." (*Id.* ¶ 87.) By 2004, "SMS was able to yield approximately 70% die [viable chips] from one wafer." (*Id.* ¶ 98.) Confidential Source No. 7 also stated that SMS was "burning money" when fewer than 80% to 90% of the die created from one wafer were "good." (*Id.* ¶ 87.) Finally, SMS was able to "run 16 million cycles and there was no sign of the chip going 'blinky.' [Confidential Source No. 10, Director of Technology Development at SMS] said that with the reliability problems SMS was having, it may have worked one more cycle and then blinked." (*Id.* ¶ 98.) According to Confidential Source No. 10, "it was the 'blinky bits' problems that SMS had worked for years to correct that ultimately let to Cypress abandoning MRAM and SMS's demise." (*Id.* ¶ 103.) However, this source also opined that the MRAM "technology would eventually work." (*Id.* ¶ 96.)

Confidential Source No. 10 admitted that SMS did send "proof of concept" MRAM samples to several customers between November 2004 and January 2005 and received positive feedback. (Am. Compl. ¶ 99.) However, he asserts that the customers only ran tens of thousands of cycles on the MRAM, which was not sufficient to encounter the blinky bits problem. (*Id.*)

### 5. Claims in Amended Complaint

The Amended Complaint alleges that all Defendants violated Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, and that the Individual Defendants, as controlling persons of NVE, also violated Section 20(a) of the Exchange Act, all by disseminating false and misleading information about NVE, which artificially inflated its stock price.

### B. Procedural Background

On February 10, 2006, Plaintiff Carole Kops filed a class action complaint against NVE, Baker, Daughton, and Kaszubinski.

On July 17, 2006, the Court consolidated Kops' case with two other similar cases and appointed Lead Plaintiffs and Lead Counsel. On September 18, 2006, Plaintiffs filed the Amended Consolidated Class Action Complaint. Defendants NVE, Baker, and Daughton now move to dismiss the entire Amended Complaint with prejudice.

## III. DISCUSSION

### A. Standard

The Court will only grant a motion to dismiss "if the plaintiffs cannot prove any set of facts which would entitle them to the relief requested." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 888–89 (8th Cir. 2002) (citation omitted). The Court "construe[s] the complaint liberally, taking all factual allegations as true, but rejecting conclusory or catch-all assertions of law and unwarranted inferences." *Id.* at 889 (citation omitted).

"When deciding a motion to dismiss, a court may consider the complaint and documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir.2003) (citation omitted). The Court can consider SEC filings that were required by law to be filed and are not offered to prove the truth of their contents. *Id.* at 832. In this case, the relevant SEC filings are excerpted in the Amended Complaint, so it is appropriate for the Court to examine them on this motion to dismiss.

The Private Securities Litigation Reform Act ("PSLRA") provides "special heightened pleading rules" for securities cases such as this one. *Id.* at 824.

In order to proceed on claims brought pursuant to section 10(b) and Rule 10b–5, the Class is required to show four

elements: (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security.

*In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d at 888 (citations omitted).

Under the Reform Act the complaint must also 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation ... is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.' 15 U.S.C. § 78u–4(b)(1). In addition, the Reform Act requires 'with respect to each act or omission alleged' that a complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' 15 U.S.C. § 78u–4(b)(2). These pleading standards, unique to securities cases, were an attempt to restrain securities fraud litigation abuses such as the practice of pleading by hindsight.

*Id.* at 889 (citation omitted).

**B. Whether Plaintiffs Adequately Plead Misrepresentations or Omissions with Particularity**

**1. Whether Plaintiffs Identify Specific Statements as False or Misleading**

Defendants assert that the statements identified by Plaintiffs are not misleading or false or are not specifically identified. As an example of Plaintiffs' failure to specify false or misleading statements, Defendants point to Paragraph 107 of the Amended Complaint, in which Plaintiffs quote four paragraphs from an August 2003 press release, but do not identify which statement, in particular, was false or misleading. (*Id.* ¶¶ 107–08.) Defendants are correct that, throughout the Amended Complaint, Plaintiffs quote large portions of announcements and interviews and do not address the majority of these statements. Plaintiffs only address the falsity or misleading nature of the portions of statements in bold.

The Court interprets the Amended Complaint to only allege that the statements in bold are the allegedly actionable statements. To the extent that Plaintiffs intended to base their claims on the entire quotations, the non-bold portions of the quotations are dismissed for failure to specify why those portions of the statements are misleading.

Defendants argue that Plaintiffs admit that many of the statements upon which Plaintiffs' claims are based are not actionable because they are literally true, are forward-looking, or are statements of facts that are not controversial. As an example of a statement that is not literally false, Defendants point to Paragraph 101, in which Plaintiffs quote NVE's May 16, 2003, Form 10–KSB. Plaintiffs assert that the statements concerning Cypress announcing plans to produce MRAM by the end of 2003 were misleading because Defendants knew that Cypress was years away from developing successful commercial production of MRAM. (Am. Compl.¶ 102.) However, Plaintiffs do not allege that Cypress had not, in fact, announced such plans. (*Id.*)

Plaintiffs admit that, with regard to Defendants' statement in Paragraph 101, Cypress did make that announcement, so the statement was not literally false; however, they argue that the statement was still misleading.

[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects. However, the requirement is not to dump all known information with every public announcement, but the law requires an actor to provide complete and non-misleading information with respect to the subjects *on which he undertakes to speak.*

*In re K-tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 898 (8th Cir.2002) (citations omitted). "[T]he central issue ... is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor." *In re Stellent, Inc. Sec. Litig.,* 326 F.Supp.2d 970, 985 (D.Minn.2004). Thus, Plaintiffs argue that once Defendants chose to speak regarding Cypress's MRAM announcements, they had an affirmative duty to speak the whole truth and disclose that Cypress's goal was unrealistic.

Plaintiffs assert that statements regarding Cypress's announcements suggested that Cypress and SMS were close to production of economically viable and marketable MRAM devices and NVE was close to commercialization of the same. Plaintiffs argue that, in fact, Defendants knew that MRAM was not working at the time the statements were made. (*See* Am. Compl. ¶¶ 74, 103 (recounting Principal Engineer's opinion that "prevailing thought at SMS" was that "MRAM was not working" from December 2000 through December 2003 and that it would be difficult, although not impossible, to reach commercial production).) Plaintiffs claim that progress on development was not sufficient. This assertion is based primarily on the "blinky bits" problems beginning in 2002 that caused serious concerns about reliability of the yield and were not corrected through-

out the Class Period. (*Id.* ¶¶ 81–82, 87, 98, 103.)

The Court agrees that, if Cypress's announcement was false, and Defendants knew of, or had the requisite scienter with regard to, its falsity, then Plaintiffs have sufficiently alleged that the statement was false, regardless of the fact that the statement that Cypress had made such an announcement was technically true. The Court addresses the sufficiency of Plaintiffs' identification of each statement as false in its Conclusion analyzing each alleged statement.

### 2. Whether Plaintiffs' Confidential Witness Allegations Are Sufficient

 Plaintiffs rely on allegations from a number of confidential sources in the Amended Complaint. When a PSLRA-governed complaint relies on confidential sources, the sources do not need to be named if the complaint "provid[es] sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 147 (3d Cir.2004). In order to determine if the particularity requirement is met, a court must conduct "an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Id.; see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 668 (8th Cir.2001) (holding that plaintiffs did not need to name confidential informant and that allegations regarding confidential information were sufficient because the complaint "recites details of a particular conversation with a particular person").

Plaintiffs assert that they have adequately described their confidential

sources. They claim that the allegations are based on information provided by twelve present or former NVE, Cypress, and SMS employees. They have provided that each source worked at one of the three companies during the Class Period, except Confidential Source No. 9, who was laid off on October 15, 2001. (*See* Am. Compl. ¶ 93.) The Amended Complaint provides descriptions of the sources' job titles and sometimes explains their job responsibilities. Plaintiffs claim that the sources' statements are corroborated by each other and by other facts. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 31 (1st Cir.2002) (holding confidential source allegations were sufficient when fraud allegations were specific and provided by sources with personal knowledge, and sources' accounts were corroborated by other sources).

Defendants assert that the Amended Complaint contains no precise factual allegations that would allow the confidential sources to proclaim the type of specific facts that would give rise to an inference of fraud.

■ Defendants note that Plaintiffs sometimes provide little information regarding the source's job. For example, Plaintiffs describe Confidential Source No. 5 as a Process Development Engineer, but do not state for which company he worked, what his job responsibilities were, how he acquired the information, when he acquired the information, or how long he was employed. (Am. Compl. ¶ 105 n. 4.) The Court agrees that his statements that Baker was a "spin doctor" or that "people had taken issue" with Baker's statements about NVE are too vague to take into account, particularly in light of the scant information on the source and his basis for knowledge.

■ Similarly, Plaintiffs state that Confidential Source No. 12 "worked at NVE from 2001 to 2004 in the Equipment and Building Maintenance Division," but do not indicate his job title, to whom he reported, or his role and responsibilities within the company. (*Id.* ¶ 67.) Plaintiffs recount that he heard unidentified NVE employees calling MRAM the "technology of the future that will never happen." (*Id.*) His statement is not sufficient because Plaintiffs provide scant description of the source, his position within NVE, or his basis for knowledge. Moreover, he merely recounts an "inside joke" of unidentified NVE employees, without providing any reason for the Court to conclude that these employees had a basis for that particular opinion.

■ Also, the Court disregards the opinion of Confidential Source No. 9 that "MRAM testing at Cypress was not going well." (Am.Compl.¶ 93.) This source ceased working at NVE in October 15, 2001, and the Amended Complaint provides no explanation for the basis for her opinion that the Cypress testing was not going well; nor does it explain when she formed this belief.

Defendants also note instances in which witnesses were not employed by or involved with SMS or NVE during the Class Period, or in which sources make comments unrelated to the Class Period. Other confidential sources report hearsay from unidentified sources, discuss events that occurred after they left the company, or make allegations regarding information to which they would not have had access as demonstrated by their job descriptions.

Defendants argue that, altogether, the confidential sources offer general descriptions of technological problems that were being experienced on the MRAM project, but do not provide any facts to show the magnitude of the problems. For example, they state that the process was "difficult" and that there were "doubts" regarding whether the MRAM technology would

work. (Am.Compl. ¶¶ 67, 69, 74.) They also discuss specific technical issues faced by engineers at SMS, but do not provide facts to show that the problems were insurmountable. (*Id.* ¶¶ 81–82, 87, 98.) Defendants argue that the development of any new technology faces problems, but that Defendants' statements regarding MRAM were not misleading unless the problems were significant.

Defendants are correct that many of the references to confidential sources are unsupported, irrelevant, or rely on vague hearsay. But some of the statements are specific and matched to relevant job descriptions. The reliability of the confidential sources is taken into account when the Court analyzes each allegedly false or misleading statement at the Conclusion of this Order. For the reasons previously explained, the Court disregards allegations by Confidential Sources 5, 9, and 12. Overall, the Court agrees that the confidential sources fail to allege that the technological development problems with MRAM, particularly the blinky bits problem, were insurmountable barriers to commercial MRAM development. Rather, the confidential source allegations show only that there were technological development difficulties, that some employees considered these problems serious, and that these difficulties delayed successful commercialization.

### 3. Patent Allegations

Defendants assert that Plaintiffs' patent-related allegations are insufficient. They assert Plaintiffs fail to even adequately allege that NVE's patents are invalid.

Once a patent is issued, it is presumed to be valid and that presumption can only be overcome by clear and convincing evidence. 35 U.S.C. § 282; *Medtronic, Inc. v. Daig Corp.*, 611 F.Supp. 1498, 1507 (D.Minn.1985). Even when there has been a claim against a company's patent, plaintiffs must allege that the defendants knew their patents were invalid. Here, Plaintiffs merely cite to prior art but fail to even make a prima facie case of patent invalidity.

In *Gompper v. VISX, Inc.*, the plaintiffs alleged that the defendants were liable for securities fraud because they made positive statements about the company's future growth and patent portfolio although they allegedly knew that the patents were invalid. 298 F.3d 893, 895 (9th Cir.2002). The court held, "Though the complaint adequately demonstrates the defendants were unquestionably aware of [the] claim against one of their core patents, in the end it fails to demonstrate the link between awareness of the claim and knowledge that the patents were therefore invalid." *Id.* at 895–96 (citations omitted). In this case, Plaintiffs do not allege any claim against NVE's patents. Additionally, as in *Gompper*, Plaintiffs have failed to attribute any particular knowledge to Defendants that the patents are invalid.

■ The Court agrees with Defendants and dismisses all of Plaintiffs' allegations related to the validity of NVE's patents. Even assuming that Plaintiffs have adequately pled invalidity, which is doubtful, the Amended Complaint lacks sufficient scienter allegations that Defendants were aware of the alleged invalidity of their patents or did not sincerely believe in their validity.

### C. Whether Plaintiffs Adequately Plead Facts Giving Rise to a Strong Inference of Scienter

### 1. Standard

■ In order to survive a motion to dismiss, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–

4(b)(2). The required state of mind is "the intent to deceive, manipulate, or defraud." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir.2003) (citation omitted).

In general, inferences of scienter tested under the Reform Act will not survive a motion to dismiss if they are only reasonable inferences—the inferences must be both reasonable and strong. Cases from other circuits suggest that a strong inference of the required scienter may arise where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor. *Id.* (citations omitted). Plaintiffs can establish scienter in three main ways: by pleading 1) "facts demonstrating a mental state embracing intent to deceive, manipulate, or defraud;" 2) "conduct which rises to the level of severe recklessness" if the plaintiffs allege "highly unreasonable omissions or misrepresentations involving an extreme departure from the standards of ordinary care, and ... present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it;" and 3) allegations of "unusual or heightened motive" and opportunity. In re *K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 893–94 (8th Cir.2002) (citations omitted).

### 2. Defendants' Knowledge of Falsity of Their Statements

"One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001). Plaintiffs assert that they have alleged such a fact pattern here.

Plaintiffs claim that Cypress's and SMS's difficulties with the MRAM project were well known by employees within NVE. (Am. Compl. ¶¶ 67, 75 (recounting general workplace discussion that NVE's MRAM technology would not work).) However, the Court has already discounted Confidential Source No. 12's statement regarding workplace opinion. Confidential Source No. 3 recounts that during mid-to-late 2002, "there was open talk among SMS employees" that MRAM technology would not work. (*Id.* ¶ 75.) However, this allegation does not provide detail about which employees had the opinions or any details to support the basis for their opinions. Nor does either source state that the employees relayed these opinions to the Individual Defendants.

Additionally, general difficulties in technology development are part and parcel of any attempt to commercialize new technology. In this case, based on the types of statements made by Defendants, in order to allege that Defendants knew their statements were false, Plaintiffs must allege that Defendants knew the difficulties in MRAM technological development were insurmountable or particularly significant. Knowledge that there were some obstacles to development that SMS was working to resolve or that engineers experienced frustration is not sufficient to show knowledge of falsity.

The Court addresses each Individual Defendant's alleged knowledge in turn.

#### a. Kaszubinski's Scienter

Plaintiffs allege that Kaszubinski attended twice-daily status meetings with SMS employees, including confidential sources, to review the testing results for the day and other MRAM development issues.

(*Id.* ¶¶ 76, 80, 94.) He participated in daily meetings with other employees and also gave weekly progress reports to Cypress personnel on the MRAM project. (*Id.* ¶¶ 69, 80, 89.) Among other things, "engineer frustrations were presented" at the weekly meetings. (*Id.* ¶ 69.) Kaszubinski also attended quarterly board meetings and staff meetings every few weeks at which he provided updates on SMS's work and made comments "about the new wafers, as well as the status and progress of developments." (*Id.* ¶ 91.) "[T]echnical aspects of the MRAM progress" were discussed at meetings with Kaszubinski. (*Id.* ¶ 92.) These allegations allege daily or twice-daily meetings with Kaszubinski and frequent discussions of test results. However, the confidential sources do not allege that, at these meetings, employees relayed to Kaszubinski that there were insurmountable or significant problems with MRAM development.

The Amended Complaint also alleges that Kaszubinski provided information on which Confidential Source No. 1's paper, detailing obstacles to MRAM development, was based and then sent e-mails to the source "indicating the need to discuss the 'problems' with the presentation." (Am. Compl.¶¶ 64–65.) However, the excerpted paper does not state that commercial MRAM production is not possible or that commercial development will take a particular period of time. Rather, it raises questions regarding the cause of the insufficient yield, and, according to the Amended Complaint's recounting of Kaszubinski's e-mails, these were questions with which he did not agree. (*See also id.* ¶ 72.)

Moreover, a confidential source's statement that Kaszubinski "might have" indicated doubt regarding the MRAM technology or that the source "wouldn't be surprised if he did" are not the types of allegations that give rise to a strong inference of scienter. (Am.Compl.¶ 75.)

■ The Amended Complaint contains insufficient allegations to give rise to a strong inference of scienter based on Kaszubinski's knowledge of facts making the allegedly actionable statements materially inaccurate. The Amended Complaint alleges that Kaszubinski had access to details of the technological development of MRAM technology because he was heavily involved in the project. The Court addresses the Individual Defendants' access to information in subpart d.

### b. Daughton's Scienter

Confidential sources had regular contact with Daughton (Am.Comp.¶¶ 68, 95), and one source thought that Kaszubinski gave weekly MRAM progress reports that Daughton attended (*Id.* ¶ 69). Among other things, "engineer frustrations were presented" at the weekly meetings. (*Id.* ¶ 69.) One source reported that Daughton was "often" present at SMS during mid-to-late 2002, when there was "open talk among SMS employees that Daughton's technology ... would not work." (*Id.* ¶ 75.) Another source reported that in 2002 and the first part of 2003, Daughton was present at SMS between two and four times per year. (*Id.* ¶¶ 84–85.) In 2004 and 2005, Daughton was present at SMS approximately four times per year. (*Id.* ¶ 80.) Yet another source reported that Daughton was present at SMS up to one time per month. (*Id.* ¶ 95.) Daughton also attended meetings where SMS reported to Cypress. (*Id.* ¶ 85.) Another confidential source stated that Baker, Daughton, and Kaszubinski were present at quarterly board meetings and weekly staff meetings where Kaszubinski routinely provided updates on the MRAM project. (*Id.* ¶ 91.) Also, technical aspects of the MRAM progress were discussed at meetings with engineers, Kaszubinski, Daughton, and Baker. (*Id.* ¶ 92.)

The Amended Complaint contains insufficient allegations to give rise to a strong inference of scienter based on Daughton's knowledge of facts making the allegedly actionable statements materially inaccurate. There is no allegation that any particular or significant problems with MRAM development were reported to Daughton, beyond engineers' "frustrations." As a high-ranking executive, Daughton was somewhat involved in the project, being present at SMS from approximately once a month to twice a year, and participating in some meetings. The Court addresses the Individual Defendants' access to information in subpart d.

### c. Baker's Scienter

Baker was present at quarterly board meetings and regular staff meetings every few weeks, during which Kaszubinski would provide updates on SMS's work. (Am.Compl.¶ 91.) "[T]echnical aspects of the MRAM progress were discussed in meetings" that Baker attended. (*Id.* ¶ 92.)

The Amended Complaint contains insufficient allegations to give rise to a strong inference of scienter based on Baker's knowledge of facts making the allegedly actionable statements materially inaccurate. There is no allegation that any particular or significant problems with MRAM development were reported to Baker or that Baker was significantly involved in the MRAM development project. The Court addresses the Individual Defendants' access to information in subpart d.

### d. Individual Defendants' Positions

Plaintiffs also assert that NVE's potential to commercialize MRAM technology was the single most important aspect of NVE's business and was driving its stock price. (Am.Compl.¶¶ 136, 173.) Although persons' positions within a company cannot alone establish scienter, Plaintiffs note that the fact that a person is "the most

senior executive of the Company is a fact relevant in … weighing of the totality of the allegations." *Adams v. Kinder–Morgan, Inc.,* 340 F.3d 1083, 1106 (10th Cir. 2003).

The Court takes into consideration that all three Individual Defendants were high-ranking executives: Baker was NVE's CEO, President, and Director. Daughton was NVE's Chief Technology Officer and Director; he was also on the Board of Directors of SMS. Kaszubinski was an NVE Director, as well as President, CEO, and Director of SMS. Their positions weigh in favor of Plaintiffs in the Court's analysis of Plaintiffs' scienter pleadings. However, the Individual Defendants' high-ranking positions and attendance at meetings do not alone create a strong inference of scienter. *See Goplen v. 51job, Inc.,* 453 F.Supp.2d 759, 768, 768 n. 8 (S.D.N.Y.2006) (holding that person's position within company and alleged "attendance at management and Board of Directors meetings" does not create strong inference of scienter). Allegations that the Individual Defendants were aware of technological difficulties regarding MRAM development simply because they were sometimes physically present at SMS are insufficient. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000) (citation omitted), *disagreed with on other grounds In re Navarre Corp. Sec. Litig.,* 299 F.3d 735 (8th Cir.2002). *See also In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1087–88 (9th Cir.2002) (holding allegations that defendants attended "management and board meetings" and read various financial reports "comparing Vantive's *actual* financial results to *projected* results" was insufficient to allege knowledge of problems in producing and

selling products because plaintiffs "failed to include corroborating details of the internal reports" such as "dates or contents of reports" or how plaintiffs learned about the reports). Defendants assert that, under this standard, Plaintiffs have failed to provide particularized facts showing that Defendants knew that what they stated publicly regarding the development of commercial MRAM was false.

The Court agrees that Plaintiffs have failed to show that Individual Defendants knew that their statements regarding commercial MRAM development were false. As previously discussed, there are no specific allegations that particular MRAM development problems were conveyed to any of the Individual Defendants. Plaintiffs have alleged that Defendants were high-ranking executives involved in MRAM development, particularly Kaszubinski. However, the Amended Complaint never sufficiently alleges that the MRAM development problems were insurmountable or made specific time lines impossible or highly unlikely. There are allegations of general employee fears and individual beliefs regarding the possible success of MRAM, but no specific information to which Defendants had access that made their optimistic statements false.

### 3. Temporal Proximity

██ Among the factors relevant to a finding of scienter is the proximity between the allegedly fraudulent statement or omission and the disclosure of inconsistent information. *See In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 745 (8th Cir.2002) (citing with approval the "nine factors usually relevant to scienter" set forth in *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir.2001), which include "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information").

Plaintiffs assert that, in this case, there is close temporal proximity between Defendants' fraudulent statements and their revelation of the contrary truth. On February 14, 2005, Cypress announced that it was discontinuing its MRAM project and divesting its MRAM subsidiary, indicating that it could not develop an economically viable MRAM product. (Am.Compl.¶ 164.) Two weeks earlier, Baker and Kaszubinski had praised Cypress's "impressive accomplishment" of producing "fully functional" MRAM alpha samples. (*Id.* ¶ 159.) Baker referred to the alpha samples as "remarkable devices," and Kaszubinski characterized MRAM as "the answer to a critical need in semiconductor memory applications" and praised Daughton and NVE for their "important" contribution toward "reaching this milestone." (*Id.*)

Three months before the February 14 divestment, Baker defended SMS's MRAM technology against accusations that Cypress "appears no closer that it has been to producing a commercially viable MRAM-based product," by stating: "NVE is in a good position to capitalize on the commercialization of MRAM technology;" "Cypress has said they expect to see production in early 2005;" and "[w]e hope to introduce products at the same time as Cypress." (*Id.* ¶¶ 152–53.) Plaintiffs argue that the close time period between NVE's statements and the February 14 announcement demonstrate scienter.

Defendants assert that Plaintiffs have not clearly indicated what "truth" was revealed. They argue that there is no specific fact to show that Defendants knew, early in the Class Period, that they would not seek to commercialize MRAM or that Defendants knew that the MRAM project would be a technical bust or too expensive to commercialize. Defendants also claim that there is nothing inconsistent about NVE announcing that it had fully function-

ing MRAM alpha samples a few weeks before Cypress announced that it was discontinuing its MRAM project because one of the reasons Cypress · discontinued the MRAM project was cost. They assert that the cost of production would not be fully realized until after production of a fully functioning MRAM alpha sample.

Plaintiffs allegations regarding temporal proximity are weak. First, most of the allegedly misleading statements were made long before the February 2005 divestment announcement by Cypress. Second, as Defendants note, many of the statements are not contradicted by Cypress's divestment announcement. The production of alpha samples was not inconsistent with Cypress's decision to divest. However, NVE's statement that Cypress expected to see production in early 2005, made on November 23, 2004, was contradicted by Cypress's February 14, 2005, divestment, approximately three months later. Three months is not a particularly close temporal proximity, but the Court will weigh this closeness in time in its overall analysis of scienter.

### 4. Defendants' Motive to Inflate Stock Prices

#### a. Standard

■ "[U]nusual insider trading activity during the class period may permit an inference of bad faith and scienter." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 895 (8th Cir.2002) (citation omitted). However,

> [i]nsider stock sales are not inherently suspicious; they become so only when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information. [C]omplaints based on insider trading must allege more than that the defendant benefitted from trading because of a false statement or misleading omis-

sion; the insider trades have to be unusual, either in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved, before they will give rise to the required inference of scienter.

*In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 747 (8th Cir.2002) (citations omitted).

Plaintiffs assert that Baker's and Daughton's sales during the Class Period were unusual in timing and amount. Defendants respond that Plaintiffs have failed to indicate how the timing of the sales was unusual or suspicious.

#### b. Daughton's Sales

From July 22, 2003 through August 25, 2003, Daughton sold 213,700 NVE shares, 49.9% of his holdings, at prices as high as $27.16 per share. (Am.Compl.¶¶ 109, 181.) These sales, his first, followed a run-up of NVE share prices from a mid-May 2003 price of under $7 per share based on positive news issued by NVE. (*Id.* ¶ 131.)

Plaintiffs admit that Daughton sold his stock early in the Class Period, before the price of NVE stock had peaked, but argue that the Court can still infer that he did so because NVE's stock price had increased between 300% and 400% since the beginning of the Class Period based on Defendants' misrepresentations and he knew that the payoff from MRAM was years away and he was not certain the high stock price could be sustained. (Am. Compl.¶ 110.)

Defendants argue that the vast majority of Daughton's sales occurred approximately two months into the proposed Class Period, which spanned almost two years. (Am.Compl.¶ 181.) Thus, his sales occurred before the majority of the alleged misrepresentations took place. Defendants also note that Daughton was 66 years old when he sold his stock and he

told at least one confidential source that he decided to sell because he was getting ready to retire. (Am.Compl.¶ 110.)

### c. Baker's Sales

On January 28, 2004, Baker sold 39,000 NVE shares at $58.33 per share and on January 30, 2004, he sold 26,000 NVE shares at $56.24 per share, for total proceeds of $3,737,110. (Am Compl. ¶¶ 132, 179.) The sales were his first and liquidated 89% of his NVE holdings. (*Id.* ¶ 132.) The sales were made after eight months of positive news by NVE. The stock had risen from its $7 price in mid-May 2003 to prices of approximately $56 per share, while NVE had disseminated positive information.

Plaintiffs argue that Baker's purchases during the Class Period of 952 shares at $23.69 per share, for a total price of $22,552.88 (Ex. 26 to Jancik Decl.), are insignificant in comparison to his Class Period sales. Also, Plaintiffs note that, after his January 2005 NVE stock purchase, Baker still only held 8,837 shares. (*Id.*)

Defendants argue that Baker's sales all occurred more than one year before Cypress's announcement that it was discontinuing the MRAM project. Furthermore, he actually purchased some NVE stock in January 2005, during the Class Period.

### d. Kaszubinski

Plaintiffs make no particular allegations that Kaszubinski had a motive to make false and misleading statements.

### e. Analysis

Plaintiffs assert that Baker's and Daughton's trades were unusual and profitable. *See, e.g., In re Navarre Corp. Sec. Litig.,* Civil No. 05–1151 (PAM/RLE), 2006 WL 1795141, at *5 (D.Minn. June 28, 2006) (unpublished) (holding that plaintiffs sufficiently pled scienter when, among other facts supporting a strong inference of scienter, they pled that "Defendants sold their stock at financially advantageous times and prior to significant restatements, ... Defendants' sales of stock [were characterized] as insider trading, and ... the trading activity was unusual compared to Defendants' prior trading activity.").

Defendants point out that both Baker and Daughton could have made far more profit by selling later in the Class Period. *See Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001) ("Seven of the insiders who sold 69 percent or more of their total stock and options during the class period, did so during October and January at share prices between $52 7/8 and $56 1/4. But the share price rose to $73 in March after they had sold their stock, and when the below-expectation earnings report was released in April, the stock dropped to $49. When insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know.").

Daughton's trading was not unusual as it occurred only two months into a two-year Class Period; he sold long before the stock price peaked; and he sold his stock for less than half of the peak price. There is no evidence of unusual trading by Kaszubinski. Baker did sell the majority of his stock at a price closer to peak price. This fact does provide some support for scienter on Baker's behalf. However, Baker's sales occurred less than one year into the two-year Class Period, and the Amended Complaint otherwise provides scant allegations that he had knowledge of or access to information that NVE public statements were materially false.

█ The Court concludes that Plaintiffs have not alleged with particularity facts giving rise to a strong inference that

the Individual Defendants acted with requisite scienter. The Court has taken into account the somewhat, but not very, unusual trading by Baker, the three-month temporal proximity between NVE's reporting of Cypress's production prediction and Cypress's divestment announcement, and the Individual Defendants' high-ranking positions within NVE and Cypress and their access to information, as well as all of the Court's previous scienter analysis. It concludes that these allegations are insufficient.

### 5. Scienter of Corporate Defendant

Plaintiffs assert that they have sufficiently alleged NVE's scienter by alleging scienter against the Individual Defendants. *See Piper Jaffray Cos. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 38 F.Supp.2d 771, 779–80 (D.Minn.1999) (holding corporation's liability is "merely concurrent with or derivative of the liability of the officers and directors"). Because the Court holds that Plaintiffs have failed to sufficiently allege the scienter of the Individual Defendants, it also holds that Plaintiffs have failed to adequately plead scienter for NVE.

### D. Whether Alleged Misrepresentations and Omissions Were Material

#### 1. Standard

■■■■ To present an actionable claim for securities frauds, the alleged misstatements must be material.... While materiality is generally a question of fact reserved for the jury, alleged misrepresentations are immaterial as a matter of law where a court determines that no reasonable investor could have been swayed by the alleged misrepresentation.

. . . .

A misrepresentation or omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Alleged misrepresentations can be immaterial as a matter of law if they: 1) are of such common knowledge that a reasonable investor can be presumed to understand them; 2) present or conceal such insignificant data that, in the total mix of information, it simply would not matter; 3) are so vague and of such obvious hyperbole that no reasonable investor would rely upon them; or 4) are accompanied by sufficient cautionary statements. Cautionary language which relates directly to that which the Plaintiffs claim to have been misled, if sufficient, renders the alleged misrepresentation or omissions immaterial as a matter of law.

*In re Amdocs Ltd. Sec. Litig.,* 390 F.3d 542, 547–48 (8th Cir.2004) (citations omitted).

### 2. The Bespeaks Caution Doctrine

#### a. Standard

■■■■ The "bespeaks caution doctrine," ... provides that

when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

The cautionary language must relate directly to that by which plaintiffs claim to have been misled.

A dismissal of a securities fraud complaint under Rule 12(b)(6) should be

granted under the bespeaks caution doctrine only where the documents containing defendants' challenged statements include enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 548 (8th Cir.1997) (citations omitted). *See also* 15 U.S.C. § 78u–5 (c)(1)(A)(i) (providing a safe harbor for any "forward-looking statement [that] is ... identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement").

### b. NVE's Cautionary Statements

Defendants note that their statements were accompanied by warnings in their SEC Form 10–KSB filings. NVE's May 16, 2003, SEC Form 10–KSB filing warned, among other things,

that "failure to meet technical challenges could limit our ability to produce marketable products," explaining that its "products use new technology and we are continually developing product designs and production processes. Our production processes require control of magnetic and other parameters that are not required in conventional semiconductor processes. If we are unable to develop stable designs and production processes we may not be able to produce products that meet our customers' requirements, which could cause damage to our reputation and loss of revenue;"

that it had "limited influence over the rate of adoption of [MRAM] technology and MRAM technology may not build into a large or significant market," explaining that "[a] significant portion of our future revenues and profits is dependent on our licensees and manufacturing partners introducing production MRAM products. Production difficulties, technical barriers, high production costs, poor market reception and other problems, many of which are outside our control, could prevent the deployment of MRAM or limit its market potential. In addition, our licensees and manufacturing partners may have other priorities that detract attention and resources from introduction of MRAM products using our technology. Furthermore, competing technologies could prevent or supplant MRAM from becoming an important memory technology;"

that NVE "rel[ies] on a limited number of strategic relationships to reach our markets and if these relationships deteriorate our future revenue could be reduced," explaining that its "license agreements do not require [its] licensees to use our intellectual property. Our licensees could circumvent or find alternatives to our technology. We rely on these license relationships to address the MRAM market, and the deterioration of any of these relationships could significantly impair our access to the MRAM market and reduce future revenues;" and

that NVE's MRAM patent rights may be challenged or rendered unenforceable.

(Ex 1 to Jancik Decl. at 19–23.)

NVE's May 27, 2004, SEC Form 10–KSB filing warned, among other things,

that "[o]ur reputation could be damaged and we could lose revenue if we fail to meet technical challenges required to product marketable products," explaining that "[o]ur products use new technology and we are continually researching and developing product designs and production processes. Our production processes require control of magnetic and other parameters that are not required in conventional semiconductor

processes. If we are unable to develop stable designs and production processes we may not be able to produce products that meet our customers' requirements, which could cause damage to our reputation and loss of revenues;"

that its "business may suffer because we have limited influence over the rate of adoption of our technology, and MRAM technology may not build into a large or significant market," explaining that "[a] significant portion of our future revenues and profits is dependent on our licensees and manufacturing partners introducing MRAM products. Production difficulties, technical barriers, high production costs, poor market reception or other problems, almost all of which are outside our control, could prevent the deployment of MRAM or limit its market potential. In addition, our licensees and manufacturing partners may have other priorities that detract attention and resources from introduction of MRAM products using our technology. Furthermore, competing technologies could prevent or supplant MRAM from becoming an important memory technology;"

that NVE's "licensees may not be able to make commercially viable MRAMs, which would limit our revenue from MRAM and likely cause our stock price to decline," explaining that "MRAM is a new technology, and we are almost completely dependent on our licensees to convert our intellectual property into commercially viable MRAM. While our licensees have made prototypes and samples, several technical and manufacturing issues must be resolved before commercially viable devices can be produced, and these problems may never successfully be solved. Cypress has said they have made working MRAM, but has missed several schedule targets for sample devices, and further delays could have a material impact on our

revenues from MRAM. Motorola has announced plans for pilot production by late 2004, but any delays could have a material impact on our potential MRAM license revenues;"

that NVE is "highly dependent on Motorola" and its success in embedding MRAM, but that "[t]echnical difficulties with embedding, production difficulties, high production costs, or other problems, almost all of which are outside our control, could limit our potential MRAM royalties;"

that NVE is "highly dependent on Cypress for potential supply of MRAM devices using their designs and may lose revenue if we need to replace Cypress as a supplier," explaining that "[i]f Cypress is unable to manufacture devices for us for any reason, it could be difficult for us to find another manufacturer for their designs;"

that "Cypress could cancel their MRAM development program at any time because of financial or other consideration. A cancellation of their MRAM program would likely eliminate our opportunity to sell devices based on their designs;"

that NVE's "license agreements do not require our licensees to use our intellectual property" and that "[i]t is possible that our licensees might make MRAM devices without using our technology or infringing on our patents, and we would not receive royalties on such devices;" and

that NVE may be unable to enforce its intellectual property rights.
(Ex. 2 to Jancik Decl. at 15–17.)

██ These warnings were incorporated into NVE's subsequent press releases either by reference or explicitly. (*See* Exs. 4, 11–12, 14–17, 21–22 to Jancik Decl.) "SEC filings incorporated by reference are adequate to invoke the Safe Harbor provi-

sion for forward-looking statements." *In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F.Supp.2d 675, 684 (D.Md.2002) (citations omitted). *See also Yellen v. Hake*, 437 F.Supp.2d 941, 963–64 (S.D.Iowa 2006) (collecting cases so holding).

### c. Analysis

■ Meaningful cautionary language need not explicitly mention the realized risk, as long as it warned of risks of similar significance; however, a generic warning is not sufficient under the bespeaks caution doctrine. *Yellen*, 437 F.Supp.2d. at 964. Plaintiffs assert that, in this case, NVE's announcements were accompanied by general categories of risk factors applicable to NVE's ability and potential to commercialize MRAM, but did not contain warnings regarding the specific problems Cypress and SMS were encountering on the MRAM project, such as the blinky bits problem. Nor did the warnings mention that SMS had been unable to achieve economically viable yields of its MRAM chips.

■ However, the May 16, 2003, SEC filing specifically warned of technological challenges to development of MRAM technology such as the control of magnetic and other parameters and the need to develop stable designs. Additionally, the May 2004 SEC filing warned that NVE's licensees might not be able to make commercially viable MRAM and stated, "While our licensees have made prototypes and samples, several technical and manufacturing issues must be resolved before commercially viable devices can be produced, and these problems may never successfully be solved. Cypress has said they have made working MRAM, but has missed several schedule targets for sample devices, and further delays could have a material impact on our revenues from MRAM." This warning specifically addresses Cypress's failure to meet deadlines and, although not

using the specific term "blinky bits," addresses the fact that possibly unresolvable technical issues still remained. This warning is not a boilerplate warning, but is tailored to the actual risk of which Plaintiffs complain. To the extent that NVE's forward-looking statements were accompanied by these warnings, as specifically addressed in the Conclusion of this Opinion, they fall under the safe harbor and the bespeaks caution doctrine.

Plaintiffs also assert that not all of the misrepresentations alleged in the Amended Complaint are forward-looking. For example, in Paragraph 126, NVE states, "And we are seeing samples and prototypes of devices. Cypress recently demonstrated prototypes." NVE also made statements such as, "Cypress reported achieving economic yields." (*Id.* ¶¶ 118, 122.) Plaintiffs are correct that some of the statements are not forward-looking. The Court addresses each statement in turn in its Conclusion.

### 3. Puffing

■ Statements that constitute puffery, "statements [that] are so vague and such obvious hyperbole that no reasonable investor would rely upon them," are not actionable. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.1997). "[S]oft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth. No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market." *Id.* (citation omitted).

Defendants argue that many of the statements identified by Plaintiffs are puffery or general optimistic statements. For example, Defendants claim that NVE's statements that its licensees were "leading the race" to develop MRAM (Am.

Compl. ¶ 118) and that MRAM is something that comes around "once in [a] lifetime" (*Id.* ¶ a 113) are classic puffery and, therefore, immaterial as a matter of law. *See, e.g., Parnes,* 122 F.3d at 547 (holding that, as a matter of law, "any misrepresentation regarding the Defendants' prediction of 'significant growth' is immaterial" as puffery).

Plaintiffs argue that statements regarding quality can be considered to be more than puffery. *See City of Monroe Employees Retirement Sys. v. Bridgestone Corp.,* 399 F.3d 651, 672 (6th Cir.2005) (holding that statement that "[w]e continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires," was not mere puffery in light of multiple lawsuits filed against Bridgestone based on tire quality and several calls for recalls from safety groups). However, the Bridgestone case hinged on the fact that the company had stated that "objective data" supported its claim. *Id.* at 672–74. Optimistic statements by Defendants in this case regarding the general importance and quality of the MRAM technology did not contain any assertion that the statements were supported by "objective data" or were otherwise subject to verification by proof.

■■■ As specifically applied to particular statements in the Conclusion of this Opinion, the Court agrees that some of NVE's statements are so vague that they constitute puffery. The Court also concludes that Defendants' statements regarding MRAM's development must be viewed in light of the fact that MRAM is an innovative and developing technology, which Plaintiffs do not dispute. *See, e.g., In re Nokia Oyj (Nokia Corp.) Sec. Litig.,* 423 F.Supp.2d 364, 405 (S.D.N.Y.2006) (noting the "the uncertainty inherent in contemporaneously predicting market trends and technological developments"

and holding that, when a company was attempting to fix its technological problems, it "was well within reason to have an optimistic outlook about its new products"). Here, there is no allegation that, until SMS was divested, it ceased working to solve obstacles to MRAM commercialization, such as the blinky bits problem.

### E. Conclusion: Analysis of Each Alleged Statement

The Court concludes that Plaintiffs' Amended Complaint must be dismissed in its entirety. It addresses each allegedly fraudulent statement in turn.

The substance of **Paragraph 101** is that, on May 16, 2003, in its SEC Form 10–KSB, NVE stated that it had intellectual property relating to MRAM, that its licensee, Cypress, "has announced a goal of the first production MRAM devices in calendar 2003," and that another licensee, Motorola, "has announced a goal of producing MRAM samples in 2003." NVE stated that "[i]f MRAM products are produced under our license agreements, we could potentially earn significant royalty revenues." It explained that Cypress had agreed to manufacture MRAMs for it and that the devices "might be sold in niche markets where NVE has a strong presence such as factory automation or military applications."

Plaintiffs specifically allege that statements regarding NVE's intellectual property and statements regarding Cypress's plans to produce MRAM by the end of 2003 were materially false.

With regard to NVE's reference to its patents, as previously explained, the Court holds that Plaintiffs have failed to adequately plead that the statement was false—i.e., that NVE's patents were invalid or unrelated to MRAM—or that Defendants had the requisite scienter. There is no indication that Defendants did not sin-

cerely believe that their patents were valid.

 With regard to NVE's reference to Cypress's and Motorola's production goals, these statements have the potential to be false if Defendants knew that Cypress's and Motorola's goals could not be achieved. Plaintiffs did plead that there were some problems with SMS's development of MRAM in May 2003; however, Plaintiffs have not sufficiently pled that the problems were so large and insurmountable that the statement was false. The pleadings also establish that SMS continuously attempted to resolve these problems. Similarly, Plaintiffs have failed to plead that Defendants had requisite scienter—that they knew Cypress's goal was not possible, rather than that they were being overly optimistic. There is no indication regarding the falsity of Motorola's goals or of Defendants' scienter regarding those goals. Additionally, the statements are protected forward-looking statements under the bespeaks caution doctrine in light of the risk factors listed in the May 16, 2003, filing, such as the possibility of the "failure to meet technical challenges" and "to develop stable designs and production processes." In fact, the statement regarding Cypress's and Motorola's goals is followed by the statement that, "[i]f MRAM products are produced under our license agreements, we could potentially earn significant royalty revenues." The prediction of possible royalty revenues is modified by the word "potentially" and by the requirement that MRAM products are actually produced under the license agreements. NVE explicitly warned that neither Cypress nor Motorola was required to produce MRAM products based on NVE's technology. Plaintiffs have not adequately pled that the royalty statement was false. Nor have they pled that the statement regarding possible markets was false or that Defendants possessed the required scienter regarding that statement. Plain-

tiffs' claims based on the statement in Paragraph 101 are dismissed.

The thrust of **Paragraph 105** is that, in a May 22, 2003, press release, NVE stated that its contract with the Office of Naval Research to develop MRAM is a continuation of NVE's governmental funding that "has resulted in several important advances in the race to develop a manufacturable MRAM chip;" the "contract further strengthens our MRAM intellectual property portfolio, which is already one of the best in the industry;" and Kaszubinski called MRAM " 'the Holy Grail' of memory" that would "find applications everywhere" and "[o]nce it hits mainstream production, it will attack every established memory market."

The Court concludes that the first phrase regarding "important advances" is vague puffery. Additionally, Plaintiffs have not pled that the continuation of governmental funding did *not* result in important advances.

The Court holds that the second phrase, regarding intellectual property, is not actionable for the reasons discussed with regard to Paragraph 101. Additionally, Plaintiffs have not adequately pled that the contract did not strengthen NVE's intellectual property portfolio or that its portfolio was not at least "one of the best" in the industry.

 The Court holds that the "Holy Grail" comment is inactionable puffery and hyperbole that is not capable of disproof and that the last prediction is also vague, optimistic puffery. Furthermore, these are forward-looking statements that are accompanied by meaningful cautionary warnings incorporated by reference into the press release. Plaintiffs' claims based on the statements in Paragraph 105 are dismissed.

The substance of **Paragraph 107** is that, in an August 4, 2003, press release, NVE stated that it has licensed MRAM intellectual property to several companies, including Cypress, Honeywell, and Motorola; that Cypress and Motorola have demonstrated prototype MRAMs in the past year and announced plans for product introductions in 2003; and that NVE has a contract for Cypress to manufacture MRAMs for NVE.

The Court dismisses claims based on the intellectual property statement, for the reasons explained above. Additionally, Plaintiffs have not pled that the first statement was false—that NVE did not license intellectual property to the listed companies.

The Court dismisses claims based on Cypress and Motorola's product introduction plans because, as explained with regard to Paragraph 101, Plaintiffs have not sufficiently pled that the MRAM development problems were so large and insurmountable that the statement was false. Similarly, Plaintiffs have failed to plead that Defendants had requisite scienter— that they knew Cypress's goal was not possible, rather than that they were being overly optimistic. There is no indication regarding the falsity of Motorola's goals or of Defendants' scienter regarding those goals.

Plaintiffs have failed to plead that the statement that Cypress and Motorola have demonstrated prototype MRAMs was false. The Court concludes that Plaintiffs have failed to adequately plead that the last statement, regarding NVE's contract with Cypress, was false. Thus, Plaintiffs' claims based on the statements in Paragraph 107 are dismissed.

The thrust of **Paragraph 111** is that, in a September 4, 2003, article, NVE stated that it has licensed its intellectual property to Motorola and Cypress, which will produce the memory chips; that both have produced prototypes but have not sampled commercial devices yet; and that Cypress has said it is "very close to sampling the first MRAM devices."

For reasons previously stated, the Court dismisses the intellectual property allegations. Plaintiffs have not adequately pled that the statement regarding intellectual property was false. The Court dismisses the prototype statement because Plaintiffs have not adequately pled that it was false, that is, that Motorola and Cypress had not produced prototypes at that point. Plaintiffs have not adequately alleged that the last statement was false or that Defendants had the requisite scienter. Plaintiffs' claims based on statements in Paragraph 111 are dismissed.

The substance of **Paragraph 113** is that, in a September 8, 2003, article, Baker stated that MRAM production "seems to be getting fairly close to fruition;" and that "[t]his technology really is one of those things that come across once in [a] lifetime."

As to the first statement, the Court concludes that Plaintiffs have failed to sufficiently plead scienter. Moreover, Baker's opinion that MRAM production "seems to be getting fairly close to fruition" is vague and couched in multiple qualifiers, such that it is not material.

The Court dismisses the second statement, praising the importance of MRAM technology, as classic puffery. Baker's opinion that MRAM technology is the type of technology that occurs once in a lifetime is too vague to be material. Plaintiffs' claims based on statements in Paragraph 113 are dismissed.

The thrust of **Paragraph 115** is that, in an October 21, 2003, press release announcing NVE's financial results, NVE stated that Cypress and Motorola expect to introduce MRAM "in the next year;"

and that NVE revised its income prediction to account for "possible start-up expenditures associated with the commercialization, marketing, and selling of Cypress-built MRAMs."

For the reasons stated in relation to Paragraph 101, the Court dismisses the first statement. The press release also incorporates the cautionary language listed in NVE's 10–KSB, which protects this forward-looking statement under the bespeaks caution doctrine.

Plaintiffs failed to adequately plead that the second statement was false. Furthermore, the statement provides that the revisions to NVE's predictions were made to account for "possible" future expenses, so the prediction of future commercialization, marketing, and selling is couched in qualified language, making it vague and immaterial. Also, this forward-looking statement is offset by the meaningful cautionary language incorporated by reference into the press release. Plaintiffs' claims based on statements in Paragraph 115 are dismissed.

The substance of **Paragraph 118**, recounting a November 13, 2003, NVE press release, and **Paragraph 122**, recounting a November 20, 2003, NVE press release, is that NVE's licensees were "leading the race to commercialize MRAM;" that "Motorola recently announced it has delivered samples of the world's first four-megabit MRAM chips;" that "Cypress reported achieving economic yields and demonstrated MRAM prototypes;" and that NVE has contracts with Motorola and Cypress regarding MRAM. Both press releases incorporate the cautionary risk factors listed in NVE's 10–KSB filing.

The first comment is dismissed as puffery. NVE's opinion that its licensees were "leading the race" is vague. Additionally, Plaintiffs have failed to plead that the statement was false. Although NVE's licensees were facing problems with MRAM commercialization, Plaintiffs have not pled that other competitors were any closer to commercialization and, thus, farther ahead in the "race."

As to the second comment, there is no allegation that Motorola did not deliver samples, so the second statement is dismissed because it was not false.

As to the third statement, there is no evidence that Cypress did not produce prototypes at this point in time. Plaintiffs have failed to adequately allege that the statement was false. Plaintiffs have not adequately pled scienter regarding the statement that Cypress had reported that it had produced economic yields.

Finally, the Court dismisses the statement regarding NVE's contracts for the reasons previously explained regarding NVE's intellectual property. Additionally, Plaintiffs have not adequately pled that NVE did not have agreements with Motorola and Cypress. Also, to the extent that these statements made forward-looking predictions regarding whether Motorola would actually pay royalties and Cypress would manufacture the MRAMs for NVE, these statements are not actionable under the bespeaks caution doctrine because they are accompanied by the meaningful cautionary language in NVE's 2003 10–KSB filing regarding the technical challenges NVE faced, the limits to its agreements with licensees, and possible production difficulties. Plaintiffs' claims based on statements in Paragraphs 118 and 122 are dismissed.

The essence of **Paragraph 126** is that during a November 21, 2003, radio interview, in response to a question regarding when MRAM would be commercially available, Baker stated, "Motorola has said that they hope to be in production with this type of memory by late 2004, and Cypress has the schedule to get samples—they have an internal deadline—of March 31,

2004. And we are seeing samples and prototypes of devices. Cypress recently demonstrated prototypes. So they're not available yet, but hopefully in the not-too-distant future."

As far as allegations regarding Motorola's production hopes, the Amended Complaint does not adequately plead that the statements were false or that Defendants were aware of development issues at Motorola such that they had the required scienter.

 As far as statements regarding Cypress, there is no evidence that it did not demonstrate prototypes by this time. The remaining issue is whether the development difficulties at Cypress and SMS were such that the Baker's recounting of Cypress's internal sample deadline was false because Cypress was unable to develop samples by March 31, 2004, and whether Defendants had the requisite scienter regarding that deadline. One of Plaintiffs' confidential sources admits that SMS did send out samples around November 2004 and received positive feedback. Additionally, Baker qualified his statement that Cypress had its own March 31, 2004, deadline by stating, in qualified language, that "hopefully" products would be available "in the not-too-distant future." The Court concludes that Plaintiffs have failed to adequately plead that the statement regarding Cypress's internal sample deadline was false. That is, there is no allegation that Cypress did not have such an internal deadline; nor have Plaintiffs pled that the MRAM development difficulties at that time precluded production of samples by that date, particularly in light of SMS's ongoing attempts to solve the obstacles to commercialization. Additionally, Plaintiffs have failed to adequately plead that Defendants possessed the adequate scienter regarding that statement. Finally, Baker's optimistic statement that "hopefully" products would be available "in the not-too-

distant future" is couched in qualified language and is a vague future prediction that is not actionable because it is too vague to be material.

Plaintiffs' claims based on statements in Paragraph 126 are dismissed.

The thrust of **Paragraph 129** is that, in a January 20, 2004, NVE press release announcing its financial results, NVE stated that NVE and its licensees made "remarkable progress toward the commercialization of our MRAM intellectual property;" and that NVE lowered its earnings predictions to permit for possible expenditures associated with commercializing and selling Cypress-built MRAMs. The press release incorporates the cautionary language in NVE's 2003 10–KSB.

 The Court dismisses the first statement as vague puffery. "Remarkable progress" is a vague term, not subject to objective proof. Additionally, Plaintiffs have not pled that the statement was false. Although they have pled that there were problems with MRAM development, they have not pled that NVE and its licensees did not make progress toward commercialization. Whether that progress was "remarkable" is not subject to objective proof and is not material.

As noted with regard to Paragraph 115, the second statement is dismissed because it was not false. The statement provides that the revisions to NVE's predictions were made to account for "possible" future expenses, so the prediction of future commercialization, marketing, and selling is couched in qualified language, making it vague and immaterial. Finally, this forward-looking statement is offset by the meaningful cautionary language incorporated by reference into the press release. Plaintiffs' claims based on statements in Paragraph 129 are dismissed.

The substance of **Paragraph 134** is that, in a March 19, 2004, press release, NVE stated that Cypress "has made working MRAM using NVE technology;" that Cypress announced that it was "very confident that we are close to having a production-ready product;" and that NVE has certain rights to Cypress's MRAM designs and to have MRAM manufactured by Cypress. The press release incorporates the cautionary language in NVE's 2003 10-KSB. **Paragraph 136** recounts a March 23, 2004, news article quoting the March 19, 2004, press release's statement that Cypress reported that it was "close to having a production-ready product."

The Court holds that the first statement is not actionable. First, the statement does not represent that Cypress has made commercially viable MRAM, because the next sentence states that Cypress believes it is only "close" to producing a commercially viable product. Thus, in the context of the paragraph, "working" means something less that commercially viable. Plaintiffs have failed to adequately plead that Cypress's statement was false—that it had not produced MRAM that worked, although it was not yet production ready. Additionally, the Court concludes that Plaintiffs have failed to adequately plead that Defendants possessed the requisite scienter regarding this statement.

 The second sentence recounts Cypress's representation that it is "very confident that [it][i]s close to having a production-ready product." This is a forward-looking statement by Cypress, recounted by NVE through inclusion in its press release. The press release incorporates meaningful cautionary language from NVE's 10-KSB warning of the technical difficulties of producing commercially viable MRAM. It also explicitly warns of the "risks relating to making commercially viable MRAMs." Thus, the forward-looking statement is not actionable under the be-

speaks caution doctrine. Also, Plaintiffs have failed to adequately plead that Defendants possessed the requisite scienter regarding this statement by Cypress.

The third statement regarding NVE's technology agreement with Cypress is not actionable because it is not false and for the reasons discussed earlier regarding NVE's patents. Furthermore, to the extent that the statement made forward-looking predictions regarding whether NVE would actually gain rights in Cypress MRAM designs and have MRAM manufactured by Cypress, the statement is not actionable under the bespeaks caution doctrine because it is accompanied by the meaningful cautionary language in NVE's 2003 10-KSB filing regarding the technical challenges NVE faced, the limits to its agreements with licensees, the fact that its licensees could use non-NVE technology, risks to NVE's MRAM patent rights, and possible production difficulties.

Plaintiffs' claims based on statements in Paragraph 134, and repeated in Paragraph 136, are dismissed.

**Paragraph 138** alleges that, in an April 28, 2004, NVE press release announcing NVE's financial results, Baker stated, "Product sales grew very rapidly and our partners made significant strides toward production-ready MRAM." Plaintiffs have not alleged facts to show that product sales did not grow rapidly, so that statement is not actionable as false. The statement regarding "significant strides" is vague puffery, and Plaintiffs have not adequately pled that Cypress did not achieve significant goals towards production at that time. The statement does not set up a timeline for production or specify that the MRAM has been perfected. Plaintiffs' claims based on statements in Paragraph 138 are dismissed.

The thrust of **Paragraph 141** is that, in NVE's May 27, 2004, SEC Form 10-KSB

Annual Report, it stated, that, in March 2004, Cypress reported making working MRAM and was close to a production-ready product; that, in fiscal year 2005, NVE planned new products and possible MRAM sales under the Cypress agreement; and that NVE had been profitable for eight quarters but expected increased expenses in fiscal year 2005 "if" it rolled out MRAM manufacturing under the Cypress agreement.

For the reasons explained with regard to Paragraph 134, the Court finds that the first statement, regarding Cypress's representation that it had made working MRAM and was close to production-ready MRAM, is not actionable. Additionally, to the extent that the portion of the statement regarding Cypress being close to a production-ready product is a forward-looking prediction, it is protected under the safe harbor doctrine because the SEC filing contained ample meaningful cautionary language addressing the risks related to this statement, including a specific warning that Cypress had missed deadlines in the past, that certain technical problems might never be resolved, and that technological obstacles could damage NVE's reputation and revenues.

The Court dismisses the second and third statements—recounting that NVE planned new products and possible MRAM sales in fiscal year 2005 and that NVE expected increased expenses in fiscal year 2005 if it rolled out MRAM manufacturing under the Cypress agreement—as forward-looking statements protected under the bespeaks caution doctrine in light of the cautionary statements included in the filing. For example, the filing warns that if NVE is "unable to develop stable designs and production process we may not be able to produce products that meet our customers' requirements, which could cause damage to our reputation and loss of revenues." The filing also mentions "[p]roduction difficulties, technical barriers, [and] high production costs," the fact that NVE's licensees might not be able to make commercially viable MRAMs, that "several technical and manufacturing issues must be resolved before commercially viable devices can be produced, and these problems may never successfully be resolved," that Cypress has missed several sampling target deadlines, and that NVE is "highly dependent on Cypress." These cautionary statements specifically address the risks inherent in NVE's statements.

Additionally, both the second and third statements are couched in qualifying language. The second statement provides that NVE "plan[s]" new products and "possible" sales. The third statement states that NVE expects increased expenses "if" it introduces MRAM products.

Plaintiffs' claims based on statements in Paragraph 141 are dismissed.

In **Paragraph 143,** in a June 21, 2004, press release, NVE stated that the Patent Office had issued a patent to NVE that was related to MRAM and that the "patent significantly strengthens our MRAM intellectual property portfolio."

The Court holds that this statement is not actionable for the reasons addressed with regard to the intellectual property statement in Paragraph 101. Plaintiffs have not sufficiently alleged that the patent claims were false or that Defendants had the requisite scienter. Additionally, the June 21, 2004, press release explicitly warns of the "risks in the enforcement of our patents" and incorporates the cautionary language in NVE's 2004 10–KSB, which warns of risks regarding enforcement of NVE's intellectual property rights. Plaintiffs' claims based on statements in Paragraph 143 are dismissed.

In **Paragraph 146,** in a July 20, 2004, press release, NVE again stated that its

"upcoming quarters" might be less profitable due to, among other things, "expenses associated with rolling out MRAM manufactured under our technology agreement with Cypress."

The Court holds that this statement is not actionable because it is directed vaguely at the future—upcoming quarters—and is couched in the term "may." This is a forward-looking revenue statement addressed by specific meaningful cautionary statements in NVE's May 2004 filing, which is incorporated by reference in the press release. Also, Plaintiffs have failed to adequately plead scienter—that Defendants did not sincerely believe that, at some point in the future, Cypress would manufacture viable MRAM. Plaintiffs' claims based on statements in Paragraph 146 are dismissed.

In **Paragraph 148,** on August 17, 2004, NVE announced that the Patent Office notified it of the expected grant of another patent related to MRAM technology. Daughton stated, "This is a key patent.... It applies to some current MRAM designs and strengthens our MRAM intellectual property portfolio." For the reasons explained in relation to Paragraphs 101 and 143, the Court holds that this statement is not actionable. Like the press release in Paragraph 143, this press release incorporates the meaningful cautionary language in NVE's 2004 10–KSB and also explicitly warns of "risks in the enforcement of our patents." Plaintiffs' claims based on statements in Paragraph 148 are dismissed.

**Paragraph 153** recounts a November 23, 2004, interview with Baker, in which he stated 1) that NVE's patents were "viable and valuable;" 2) that its licensing agreements had "strong potential;" 3) that "MRAM has the potential to revolutionize memory design and NVE is in a good position to capitalize on the commercialization of MRAM technology;" 4) that Cypress has stated that it had produced

working MRAM and expected sample devices by the end of the year; 5) that NVE had approached potential customers; 6) that Cypress and its competitor were both capable and he could not predict which would succeed first; 7) that Cypress expected production in early 2005; 8) that NVE hoped to introduce joint samples with Cypress by the end of the year and to introduce products to the market "at roughly the same time as Cypress;" and 9) that NVE believed "passionately" in its future.

The Court dismisses the first statement for the reasons previously explained— Plaintiffs have failed to adequately plead that the statement was false—i.e., that NVE's patents were invalid or unrelated to MRAM—or that Defendants had the requisite scienter—that is, that they knew that the statement was false.

The Court dismisses the second statement because Plaintiffs have failed to plead that it was false and, in any case, the statement is vague puffery that was not material.

The Court dismisses the third statement because it is optimistic, vague puffery.

The Court dismisses the portion of the fourth statement that Cypress has reported producing "working" MRAM for the reasons explained in relation to Paragraph 134. The statement regarding Cypress's expectation of samples by the end of the year is a forward-looking statement which has not been adequately pled to be false, because Plaintiffs pled that Cypress did send out samples around November 2004.

Plaintiffs have not pled that the fifth statement, that NVE had started to approach potential customers, was false.

The sixth statement, that Cypress and its competitor were "capable" and that NVE would not predict who would produce MRAM first, is classic puffery. It is too

vague an opinion to be material. Nor have Plaintiffs adequately pled that the statement was false.

■ The seventh statement is an optimistic, forward-looking statement recounting Cypress's expectation, but it does provide a general date in the future. Plaintiffs did plead that there were continuing problems with SMS's development of MRAM in late 2004 and that some employees had concerns regarding SMS's future; however, Plaintiffs have not sufficiently pled that the problems were so large and insurmountable that the statement was false at the time it was made. Similarly, Plaintiffs have failed to plead that the Individual Defendants had requisite scienter, rather than that they were being overly optimistic.

The Court holds that the eighth statement is not actionable. Plaintiffs have pled that, at the time of the statement, SMS was sending out samples and receiving positive feedback; they have not adequately pled that NVE did not expect to introduce joint samples by the end of the year. Also, the statement that NVE planned to introduce products at approximately the same time as Cypress is vague and has not been adequately pled to be false.

The ninth statement, that NVE believed passionately in its future, is puffery and not pled to be false and is dismissed.

Plaintiffs' claims based on statements in Paragraph 153 are dismissed.

The substance of **Paragraph 157** is that, in a January 19, 2005, NVE press release reporting its financial results, Baker stated, "We expect new sensors and couplers, as well as MRAM devices and royalties, to drive future growth."

The Court holds that this statement is not actionable. It is a vague, forward-looking statement. It has no timeline for MRAM royalties. It is not a material

statement. Also, Plaintiffs have failed to adequately plead that Defendants did not believe that, at least at some point in the future, NVE's MRAM would be successful. Nor have they pled that new sensors and couplers would not drive future growth. Plaintiffs' claims based on statements in Paragraph 157 are dismissed.

**Paragraph 159** recounts a January 31, 2005, press release in which NVE announced, first, that Cypress had announced that its recent MRAM alpha samples were covered by NVE's technology agreement with Cypress. Second, it states that "MRAM is a revolutionary memory that uses electronspin to store data." Third, it recounts that "Cypress announced that it had provided fully functional 256–kilobit alpha samples." Fourth, in the release, Baker congratulated Cypress and Kaszubinski "on an impressive accomplishment," and proclaimed that the alpha samples were "remarkable devices." Fifth, Kaszubinski stated that Daughton and NVE's technology was important to Cypress in reaching that milestone and opined that MRAM was "the answer to a critical need in semiconductor memory applications—a single-chip, fast write, low power, fail safe, high-reliability nonvolatile memory."

The Court dismisses the first statement: Plaintiffs have not sufficiently pled that it was false, that is, that Cypress's alpha samples were not covered by NVE's technology agreement with it. Nor have they sufficiently pled that Defendants possessed the required scienter with regard to that statement. The Court addressed Plaintiffs' patent claims earlier in the Opinion.

Plaintiffs have not pled that the second statement was false. NVE's use of the word "revolutionary" to characterize MRAM was inactionable puffery.

Plaintiffs have not sufficiently pled that the third statement was false: they have

pled that Cypress did provide samples and received positive feedback on the samples. Even if the Court were to conclude that Plaintiffs have pled that those samples were not "functional," it determines that Plaintiffs have not pled that Defendants possessed scienter with regard to that statement.

The Court dismisses the fourth statement because congratulating Cypress and Kaszubinski "on an impressive accomplishment" is vague puffery, as is the statement that the alpha samples were "remarkable devices."

Similarly, with regard to the fifth statement, Plaintiffs have not adequately pled that NVE's technology was not important to Cypress in creating the alpha samples. They even pled that one confidential source admitted that the MRAM idea came from NVE. Moreover, the statement is vague puffery. Finally, Kaszubinski's characterization of MRAM technology as "the answer to a critical need in semiconductor memory applications—a single-chip, fast write, low power, fail safe, high-reliability nonvolatile memory" is not actionable. The statement is commenting on MRAM technology in general, not the Cypress alpha samples. Plaintiffs have failed to adequately prove that this statement was false or that Defendants possessed the requisite scienter.

Plaintiffs' claims based on statements in Paragraph 159 are dismissed.

### F. Plaintiffs' Section 20(a) Claim

Because Plaintiffs' Section 20(a) claim is derivative of a Section 10(b) claim and the Court dismisses the Section 10(b), it will also dismiss the Section 20(b) claim. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 n. 12 (8th Cir.1997).

### G. Defendants' Request for Leave to Amend

Plaintiffs ask that, if the Court dismisses some or all of their claims, they be permitted to amend their Amended Complaint. The deadline for seeking to amend the complaint has not yet passed.

■■■ Federal Rule of Civil Procedure 15(a) provides that "leave [to amend a pleading] shall be freely given when justice so requires." However, "permission to amend may be withheld if the plaintiff does not have at least colorable grounds for relief, or if she is guilty of undue delay, bad faith, dilatory motive, or if permission to amend would unduly prejudice the opposing party." *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 616 (8th Cir.2003) (citation omitted).

Defendants object to Plaintiffs' request because Plaintiffs have not indicated that they can cure the deficiencies in the current Amended Complaint, so further amendments would be a waste of judicial resources. They request that the Amended Complaint be dismissed with prejudice.

The Court has addressed why each alleged statement is not actionable. Overall, the Court holds that Plaintiffs have failed to adequately plead scienter by the Individual Defendants with regards to any claims, and by extension, have failed to adequately plead scienter by NVE. This overall failure to plead scienter is adequate grounds for dismissal of the entire Amended Complaint. Furthermore, as previously noted, many of the statements are not false, are inactionable puffery, or are protected by the bespeaks caution doctrine. The Court dismisses the Amended Complaint with prejudice because, even if Plaintiffs could allege adequate scienter, which they have not indicated that they could do, the statements are otherwise fatally flawed, as explained in this Opinion.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

Defendants' Amended Motion to Dismiss [Docket No. 45] is **GRANTED** and the case is **DISMISSED WITH PREJUDICE.**